Filed 4/30/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>CHRISTOPHER ERIC WILLIAMS,<br><br>    Defendant and Appellant. | A160530<br><br>(San Mateo County<br>Super. Ct. No. 18SF001211A) |

Appellant Christopher Williams pled no contest to one count of felony stalking (Pen. Code, § 646.9, subd. (a) [1]), was then denied mental health diversion under newly enacted section 1001.36 which took effect shortly after his plea, and was subsequently placed on probation for three years subject to various terms and conditions.

We conclude the trial court erred in finding Williams posed an unreasonable risk to public safety and thus abused its discretion in denying his request for mental health diversion. Accordingly, the judgment will be reversed.

## BACKGROUND

One day in 2015, Williams went to a local autobody shop for an estimate and became upset because he felt he had been treated in a racist manner. In response, he retaliated anonymously against the business's owners, a married couple (whom we refer to here as "husband," "wife," or

---

[1] All further statutory references are to the Penal Code.

"family," as appropriate), with an unrelenting campaign of extremely vicious and threatening harassment carried out by email and other means that continued daily for two years, until his identity was discovered and he was arrested.[2] While this was going on, he also began sending anonymous, angry and threating letters every few months to one of his neighbors after an altercation with her (by-then deceased) husband.

The record contains abundant evidence of the extremely disturbing content of Williams's communications, and the parties have summarized it accurately in their briefing. He sent the family thousands of vile and threatening emails.[3] The tenor of his anonymous letters to his neighbor was similar.[4] He also posted disparaging flyers near the family's shop, signed

---

[2] As summarized by the probation report, "He left the shop and posted a negative review of the business online. Over the course of the next two years, the defendant's anger toward the shop grew. He mailed threatening, racist and profanity-filled letters to them and posted flyers in the area to warn prospective customers that they did poor work and the owner was racist. He also used a website that allowed him to send anonymous emails in order to inundate the body shop with multiple threatening and vulgar messages each night. . . . During an investigation, an IP address associated with a computer in the defendant's home was located. A search warrant was obtained and numerous racially-charged and violent letters were found in his home office."

[3] To give some indication, one email to the family said, "FUCK FUCK YOU RACISTS FUCKERS I WILL BASH YOUR BABIES HEAD." Another threatened to "slash your wife's neck [and] then I will stab your white baby." Another said, "I could slash your wife's cunt from end to end. I hate white bitches. You're gonna die. You f'ers will all be shot one by one." Williams also posted increasingly violent, racist and threatening signs near their body shop, such one that stated, " 'Fucking white people they're all fucking racist kill them all.' "

[4] Williams sent the neighbor four letters in all, the last one disguised as a Christmas card. For example, one stated, " "If you ever fuck With me again—I will blow your fucking head off. Let me say this again: If you EVER FUCK WITH ME AGAIN I WILL BLOW YOUR FUCKING HEAD OFF! And

them up for swinger clubs, prostitution and massage solicitation online forums, and wrote threatening emails to elected officials (a United States Senator and the President) using their email address.

Williams was arrested on December 20, 2017, and released on bond the same day.

Subsequently, on February 1, 2018, Williams was charged with one felony count of stalking the family for a period of about four months the prior year (between August 1 and December 13, 2017) (§ 646.9, subd. (a)[5]), and one misdemeanor count of making a criminal threat to his neighbor, on or about December 13, 2017 (§ 422, subd. (a)).[6]  Before any preliminary hearing, he

---

if you think I'm joking. . .JUST TRY ME!  I FUCKING HATE ASSHOLES LIKE YOU!  YOU FUCKING PRICK!"

[5]  In relevant part, section 646.9 makes it a crime to "willfully and maliciously harass[ ] another person and . . . make[] a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family . . . ."  (§646.9, subd. (a).)  The term "harass" means "engag[ing] in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose."  (*Id*., subd. (e).)  The phrase " 'credible threat' means a verbal or written threat . . . or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family.  It is not necessary to prove that the defendant had the intent to actually carry out the threat."  (*Id*., subd. (g).)

[6]  Section 422 makes it a crime to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional,

pled no contest to the felony stalking charge, and the misdemeanor threat charge was dismissed with a *Harvey* waiver.[7]

Then on June 27, 2018, less than three weeks after Williams's plea, the Legislature passed an omnibus budget bill that took immediate effect (Assem. Bill No. 1810). Among other measures, the bill enacted Penal Code section 1001.36, which authorizes trial courts to grant pretrial diversion for certain defendants suffering from mental health disorders. (See Stats. 2018, ch. 34, § 24 and Legislative Counsel's Digest ¶15; *People v. Frahs* (2020) 9 Cal.5th 618, 626.) It applies retroactively to all cases in which the judgment is not yet final. (*Id.* at p. 624.)

Diversion under section 1001.36 entails "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment," for a period not to exceed two years. (§ 1001.36, subd. (c).)

If diversion is granted and the defendant completes the process satisfactorily, the defendant's criminal charges shall be dismissed and the defendant's arrest "shall be deemed never to have occurred." (§ 1001.36, subd. (e).) Criminal proceedings may be reinstated if the defendant performs unsatisfactorily in diversion or commits other crimes. (*Id.*, subd. (d).)

To be eligible for diversion, the defendant must meet six statutory criteria. (See § 1001.36, subds. (a), (b)(1).) First, the defendant must "suffer[]" from a mental disorder as identified in the most recent edition of the

---

immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ." (§ 422, subd. (a).)

[7] *People v. Harvey* (1979) 25 Cal.3d 754.

4

Diagnostic and Statistical Manual of Mental Disorders . . . ." (*Id.*, subd. (b)(1)(A).) Second, the defendant's mental disorder must be "a significant factor in the commission of the charged offense." (*Id.*, subd. (b)(1)(B).) Third, "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (*Id.*, subd. (b)(1)(C).) Fourth, the defendant must consent to diversion and waive the right to a speedy trial. (*Id.*, subd. (b)(1)(D).) Fifth, the defendant must agree to comply with treatment as a condition of diversion. (*Id.*, subd. (b)(1)(E).) And, finally, as relevant here, the court must be satisfied that "the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (*Id.*, subd. (b)(1)(F).) In evaluating these criteria, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (*Ibid.*)

Shortly after the new statute took effect, Williams asked (in a "Statement in Mitigation" prepared for the upcoming sentencing hearing) that criminal proceedings be suspended so that he could be considered for pretrial mental health diversion, asserting that the harassment he had engaged in was attributable to "a sustained period of impaired judgment due to a major mood disorder." In support, his filing referenced written evaluations from two doctors (Drs. McGlynn and Patterson).[8]

The following day (August 8, 2018), the probation department filed its report in which it acknowledged Williams's mental health issues and

---

[8] McGlynn's and Patterson's reports were attached to the probation report which was filed the next day.

5

recommended he be placed on supervised probation so he could receive continued mental health treatment.[9]  According to the probation report, Williams "presented as cooperative, honest and very emotional.  He admitted to his crimes and stated several times that he had no intention of following through with his threats, but that he wanted to embarrass or upset the recipients. . . .  He wept openly and expressed what appeared to be genuine remorse and said, 'They did nothing to deserve this treatment.  I felt horrible when I found out I scared a family.' "  The report noted that Williams's neighbor "stated that she never really thought the defendant was a threat to her, but contacted police because she wanted his actions documented."  The neighbor told the probation officer that "while she believes the defendant has possible mental health issues and needs to suffer some consequences for his behavior, 'I don't believe he's a threat, I never have.' "

---

[9]  In discussing portions of the probation report, we are cognizant of section 1203.05, which limits (but does not entirely preclude) public access to the probation report 60 days after judgment is pronounced or probation is granted.  The Legislature's intent in cloaking the report with conditional confidentiality was to restrict access only to personal information about a defendant (such as details concerning his or her family background, medical and psychological condition, financial status, military record, and substance abuse history) not nonpersonal information, such as the factual summary of an offense and the evaluations, analyses, and recommendations of the probation officer.  (*People v. Connor* (2004) 115 Cal.App.4th 669, 695-696.) "[I]n a given case, the report may not contain any personal information; it may contain only personal information that is readily available in other public documents; and the probation report contains much nonpersonal information." (*Id*. at p. 690.)  In apparent recognition of this, appellate courts sometimes quote from a probation report's factual summary of the offense (see, e.g., *People v. Salazar-Merino* (2001) 89 Cal.App.4th 590, 594-595; *People v. Mickens* (38 Cal.App.4th 1557, 1559-1560), and Williams has done so in his appellate briefing.  Williams also refers to its contents in discussing the probation officer's interview with him.  We abide by these limitations in our discussion.

The probation department recommended against a prison sentence, even though it acknowledged Williams's actions were "threatening and racist in nature" and his crime was "serious." The probation report attached and discussed reports from three mental health professionals: Williams's therapist, Lina Rappoport, who had been treating him since December 27, 2017; his psychiatrist, Dr. Lawrence McGlynn; and defense-retained expert, C. Mark Patterson, Ph.D., a forensic psychologist who had evaluated Williams. The probation department recommended Williams be placed on three years of supervised probation (plus serve a sentence of 6 months in county jail as punishment), in order to "afford him the opportunity to take advantage of probation services and receive the support he may need to continue counseling and treatment for his anger and other diagnosed mental health issues." The report also noted Williams had no history of prior arrests or convictions, "expressed great remorse and took full responsibility" for his actions and was participating in counseling.

A few weeks later, on August 24, 2018, citing principally the existing psychological evaluations conducted by Drs. McGlynn and Patterson, Williams filed a motion to withdraw his no contest plea or, alternatively, to suspend sentencing proceedings and formally requested pretrial mental health diversion.[10] He subsequently supplemented the motion with declarations by both doctors.

Dr. Patterson, who had reviewed abundant materials from the criminal case (including the probation report, and some of the emails and other materials recovered from Williams's home during the warrant search) and

---

[10] The People conceded in a later filing that if the court granted Williams's request for mental health diversion at the hearing conducted pursuant to section 1001.36, he "should be allowed to withdraw his plea at that point in time."

7

met with Williams three times, opined in his declaration that during the period of his criminal behavior, Williams was suffering from depression, chronic anxiety and trauma-related symptoms, as well as "sensitivity (or hypersensitivity) and, at times, paranoid ideation in relation to real and/or misperceived racism," and that all of these symptoms had impaired Williams's judgment and his ability to manage anger and frustration. Dr. Patterson stated that Williams "does not deny or greatly minimize his threatening behavior . . . nor does he deny or greatly minimize the consequences of his behavior to others," was remorseful and "[t]here are no indications that [he] has been beset by violent ideation or intent prior to or since the incidents." Dr. Patterson "found no evidence that Mr. Williams poses an imminent risk of danger to himself or others," because using three different risk assessment methodologies, Williams's "long-term risk of violence falls within the lowest category." Dr. Patterson concluded Williams "may benefit from psychiatric intervention and psychotherapy, and the available information suggests he will continue to improve as he participates in further treatment and continues to seek support from his closest friends."

Dr. McGlynn, a licensed professor of clinical psychology at Stanford University who had been treating Williams regularly since shortly after his arrest (beginning in January 2018), opined in his declaration that Williams had been living with a previously undiagnosed major mood disorder that resulted in a sustained period of severely impaired judgment and paranoid ideation. Williams was responding favorably to treatment and medication, and McGlynn predicted that Williams would continue to improve. He also concurred in Dr. Patterson's assessment that Williams's likelihood of reoffending was very low.

Williams's diversion request proceeded to hearings before two different judges who came to opposite conclusions.

First, on November 21, 2018, the trial court (Hon. Joseph C. Scott) conducted an evidentiary hearing. Both wife and husband testified about their experiences, and a victim impact statement from Williams's neighbor also was read into the record (she opposed Williams's request for diversion, and asked the court to impose the maximum penalty). The declarations of Drs. McGlynn and Patterson were admitted into evidence, and both doctors were cross-examined at some length. Judge Scott noted he did not intend to issue a definitive ruling on that date, including because the county did not yet have a mental health diversion program in place (the probation department was in the process of implementing one), and at the conclusion of the hearing he ordered supplemental briefing concerning the new statute.

About four months later, on March 27, 2019, while the matter was still undecided, a customer of the family's body shop observed a sign posted in the window of the car belonging to Williams's partner, stating "Do not patronize" their shop. At a status hearing on April 19, 2019, the People informed Judge Scott about this.[11]

On November 22, 2019, after receiving additional briefing, Judge Scott found Williams satisfied all of the statutory criteria for diversion under section 1001.36 and thus was eligible for diversion. Judge Scott made a specific finding, among others, that Williams did not pose an unreasonable risk to public safety.

Pursuant to local court procedure, the case was then referred for a "suitability" hearing concerning mental health diversion before another judge of the same court, and additional briefing was filed by the parties.

---

[11] The hearing was not transcribed.

9

At the subsequent hearing, held about three months later, the trial court (Hon. Lisa A. Novak) denied Williams's request for a diversion. At the outset, Judge Novak stated she had not reviewed the entire transcript of the evidentiary hearing conducted before Judge Scott but had read portions of it and the doctors' declarations. Husband then briefly testified about the terror he and his family had experienced when they were harassed by Williams two years earlier and said they continued to live in fear of him.

When Judge Novak then entertained argument, she expressed serious concerns in her questions to defense counsel about the sign stating "Do not patronize" the family's business that had been posted in the car belonging to Williams's partner back in March 2019, eight months before Judge Scott had deemed Williams eligible for diversion (in November 2019):

"THE COURT: . . . Mr. Getz, what was really disconcerting, setting aside the underlying facts for which your client now stands convicted by entry of a plea—and I don't think I need to revisit the graphic nature of the threats and the ongoing harassment that he engaged in. Having been under the care of mental health providers now for a substantial period of time, how do you reconcile that and convince the court that he doesn't present an unreasonable risk of safety to these people when just in December of 2019[12] he—and I think it's reasonable to infer that the publication of a sign in his partner's back window of his car is something that I can certainly reasonably infer he bears some responsibility for, which is still critical of this same victim and is advising or admonishing the public not to patronize this victim because this victim's business is dishonest or crooked. That is the exact same kind of behavior that is part and parcel of the underlying stalking conviction.

---

[12] This date was incorrect. Judge Novak's comment reflects she mistakenly believed the sign incident was quite recent.

10

[¶] I just cannot reconcile that with the proposition that because of treatment, he is so responsive to that treatment that he doesn't still pose an unreasonable risk to these people. Granted that publication didn't contain a threat, but it's the exact same behavior. Yet, a year and a half after the incident for which he now stands convicted, he is still fixated on that. [¶] I have a really difficult time feeling comfortable that mental health diversion is appropriate for someone whose underlying crime is as serious as his and whose treatment after a year and half has not abated the fixation or the hatred for these people." Defense counsel urged Judge Novak to consider the "overall arc" of Williams's treatment and progress, argued the sign was different than the threats underlying his offense, and told Judge Novak that after the sign was discovered, Judge Scott "ordered him to do a more formal OR release, and he has been in total compliance with that."

Judge Novak then denied Williams's request for diversion on the express ground he posed an unreasonable risk to public safety under section 1170.18. Alluding again to the March 2019 sign, she explained, "This is an extremely disconcerting set of circumstances that form the basis of the underlying conviction," noting "the repeated . . . threats to not just harm but murder this family, including their newborn child." She also reasoned, "I cannot reconcile the ongoing published harassment of the victims in this case even after he pled guilty while awaiting potential sentencing, while awaiting a determination as to whether or not he would be admitted into mental health diversion, that the very target of his threatening behavior continue to be harassed" by him. Judge Novak expressed "very grave concern" for the safety of the family. She acknowledged Williams has mental health issues and "has responded positively to treatment, but he is not in my opinion a candidate for mental health diversion."

11

At the subsequent sentencing hearing (before the Hon. Stephanie G. Garratt), the court denied Williams's motion to withdraw his no contest plea, and placed him on probation for three years with the condition he serve eight months in county jail.

This timely appeal followed.

## DISCUSSION

## I.

### *Mental Health Diversion.*

Williams argues the court abused its discretion in finding him unsuitable for mental health diversion because, contrary to Judge Novak's finding, he does not pose an unreasonable risk to public safety. The People urge affirmance on the ground Judge Novak reasonably found that Williams does pose such a risk.

The parties agree that we review the trial court's ruling for an abuse of discretion. (See *People v. Moine* (2021) 62 Cal.App.5th 440, 448-449 (*Moine*).) As this court explained at some length in *People v. Jacobs* (2007) 156 Cal.App.4th 728, various definitions of the abuse of discretion standard have been announced in numerous cases, but the standard cannot be boiled down to simply calling for reversal only if a ruling appears to be arbitrary, capricious or utterly irrational. (See *id.* at pp. 736-738.) " 'Very little of general significance can be said about discretion. " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]' " [Citation.] The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action. . . ." Action that transgresses the confines of the

12

applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Id*. at p. 737.)  Moreover, "the 'legal principles that govern the subject of discretionary action vary greatly with context.  [Citation.]  They are derived from the common law or statutes under which discretion is conferred.' " (*Ibid*.)

The parties also agree about the legal standard for assessing an "unreasonable risk of danger to public safety" as used in section 1001.36.  The mental health diversion statute incorporates the definition set forth in section 1170.18 (see § 1001.36, subd. (b)(1)(F)), which in turn defines the concept as "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of" subdivision (e)(2)(C)(iv) of section 667. (§ 1170.18, subd. (c).)  The offenses listed in the specified portion of section 667, in turn, include: any homicide offense (including any attempted homicide offense), solicitation to commit murder, assault with a machine gun on a peace officer or firefighter, possession of a weapon of mass destruction, any serious or violent felony punishable by life imprisonment or death, and certain sex offenses.  (See § 667, subd. (e)(2)(C)(iv).)

As recently explained in *People v. Moine*, *supra*, 62 Cal.App.5th 440, "The violent felonies encompassed in this definition 'are known as "super strikes" . . . . [¶] Section 1001.36's reliance on the definition of dangerousness in section 1170.18, necessarily encompasses the list of super-strike offenses found at section 667, subdivision (e)(2)(C)(iv).  By requiring an assessment of whether the defendant 'will commit a new violent felony' within the meaning of section 667, subdivision (e)(2)(C)(iv), a trial court necessarily must find the defendant is 'likely to commit a super-strike offense.'  [Citation.]  Thus, the risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies." (*Id*. at pp. 449-450.)

13

Applying this standard, *Moine* held that a trial court had abused its discretion in finding that mental health diversion of a defendant would pose an unreasonable risk to public safety in circumstances that were similar in pertinent respects to these.  In *Moine*, the defendant was charged with three counts of assault in connection with a fistfight that broke out in the waiting room of a medical facility (prompted by defendant's request to turn off the television) and two counts of making criminal threats in connection with an incident that took place about a year later in the waiting room of another medical clinic (prompted by his frustration with the way in which a prescription refill had been handled).  (*Moine, supra,* 62 Cal.App.5th at p. 444.)  The threats he made during the second incident were extremely violent:  repeatedly, he threatened the medical staff with murder.[13]

Prior to trial, defendant filed a motion for mental health diversion supported by a medical report from a court-appointed psychiatrist.  The trial court denied the motion.  The court assumed that the facts of the two incidents were true, concluded defendant's actions on those occasions meant

---

[13]  According to one witness, he said something like " ' "This is America. I can go home and get my gun and come back and shoot all of you." ' " (*Moine, supra,* 62 Cal.App.5th at pp. 444-445.)  She also said that he made other statements over the course of about five minutes that were " 'ranting,' " as he cursed, paced and talked with his hands in the air.  (*Id.* at p. 445.)  Another witness said he was visibly upset and said " 'they are lucky I don't have my gun with me, otherwise I would kill everybody here,' " and " 'I am going to come in and kill everybody here.' " (*Ibid.*)  The defendant himself admitted saying, " 'If the Parkland guy came in here, would you have been condescending to him too?,' " noted there were 30,000 gun deaths in America annually, said that " 'she was blowing caution to the wind by mocking someone who had just told her he struggles with mental health issues,' " and "cautioned her 'against being rude to strangers' because it was possible people could 'respond violently.' " (*Ibid.*)

14

he posed a danger to public safety and denied the motion on that basis. (*Moine, supra,* 62 Cal.App.5th at p. 447.)

The appellate court held the record did not support the court's implied finding defendant was likely to commit a super-strike offense if he received mental health treatment in the community pursuant to diversion, given the opinion of mental health experts about this risk of danger, his criminal record and the circumstances of the pending charges. (*Moine, supra,* 62 Cal.App.5th at pp. 450-451.) Although the defendant had four prior misdemeanor convictions, and also was facing several pending misdemeanor charges (one for resisting an officer in connection with a report of possible drug overdose, and one for petty theft for stealing medical supplies), "[n]one of [defendant's] convictions involved a violent felony, let alone a super-strike felony." (*Id.* at p. 450.) The pending charges themselves were not super-strike offenses either, even though they involved allegations of violence and threats of violence. (*Ibid.*) The appellate court also noted the prosecution did not present any evidence to suggest the defendant was likely to commit a super-strike offense in the future, and "the circumstances of the pending charges did not support such an inference." (*Id.* at pp. 450-451.) In addition, two psychiatrists had determined he posed a low risk for future assault. (*Id.* at p. 451.)

Contrasting cases where courts of appeal have affirmed dangerousness findings under section 1170.18 where individuals "had long criminal histories involving violent felonies," *Moine* concluded the trial court had erred on these facts under "the high standard applicable to a finding of 'dangerousness' under sections 1001.36 and 1170.18." (*Moine, supra,* 62 Cal.App.5th at p. 451.) It also explained its conclusion was supported by the fact the trial court had released the defendant into the community on bond for more than

two years, which "indicates the court necessarily found that [defendant] was not likely to cause 'great bodily harm to others' if released." (*Ibid*.) *Moine* reasoned, "[i]t is logically inconsistent to deny mental health diversion on the ground that [defendant] was likely to commit a super-strike offense, while simultaneously finding he was not likely to inflict great bodily injury on persons in the community." (*Ibid*.)

*Moine* compels reversal. Here, there is ample evidence Williams terrorized a family. The family was extremely afraid for its safety (as the victims in *Moine* no doubt were). And as in *Moine*, Williams's threats were violent, hateful and specific. But just as in that case, Williams's charges are not super-strike offenses, he poses a low risk to public safety in the uncontroverted opinion of two mental health professionals, there is no evidence he owned, possessed or had access to any weapons (see *Moine, supra*, 62 Cal.App.5th at p. 445, fn. 2) and he, too, was released on bond for more than two years without incident. Like the appellate court in *Moine*, we cannot sustain Judge Novak's implied finding that Williams was reasonably likely to commit a super-strike offense if granted diversion and treated in the community.

Indeed, the record of Williams's potential dangerousness is even weaker than it was in *Moine*. Unlike the defendant in that case, Williams has *no* prior criminal record, he faces *no* other pending charges in unrelated cases and, for all of his horrific threats, he never actually assaulted anyone or engaged in any violence.[14] We recognize that, unlike in *Moine*, here there is

---

[14] There also is no substantial evidence he ever intended to carry out the horrific threats that he made, and the People do not contend otherwise. Indeed, neither the stalking charge nor the criminal threats charge required proof that he intended to carry out his threats against the family or his neighbor. (See §§ 646.9, subd. (g), 422, subd. (a).)

16

evidence that, after little more than a year of voluntary treatment, Williams continued to harbor resentment against his victims (the family), evidenced by the sign he posted in his partner's car urging a boycott of their body shop. But, as Judge Novak recognized, his conduct on that one isolated occasion was not violent or threatening; nor did it indicate any intention to engage in violent acts much less a super-strike offense. Indeed, Judge Scott deemed Williams eligible for diversion and specifically found he posed no threat to public safety, eight months *after* having been apprised of this incident.

In reaching a contrary finding, Judge Novak erroneously believed the sign had been posted much more recently (in December 2019, which was nine months later than the actual incident and just two months before the hearing over which she presided). In fact, by the time of the hearing before Judge Novak in February 2020, there had been no further incidents of any kind for nearly a year. Williams's brief, non-violent and completely isolated lapse in judgment in March 2019, while undergoing what appears to have been otherwise successful treatment, in no way constitutes substantial evidence he posed an unreasonable risk of committing a super-strike offense against the family or anyone else. Indeed, regardless whether his ongoing mental health treatment had by then cured his psychological ailments, it certainly appears to have prevented a recurrence of their threatening (and criminal) symptoms, which is exactly in keeping with the legislation's goals.

Although the court's error regarding the danger element of the diversion statute compels reversal here, for the benefit of the trial courts we make the following observations. In enacting a mental health diversion program, the Legislature sought to expand the use of community-based mental health treatment in order to prevent defendants with treatable mental illness from cycling in and out of our criminal justice system. As this

court recently explained, the Legislature enacted this measure in response to the large and growing number of mentally ill persons who are incarcerated in California, including in our overcrowded prisons, and we have criticized its under-utilization. (See *People v. O'Hearn* (2020) 57 Cal.App.5th 280, 300-301.) The Legislature's expressly stated purposes are to " 'promote . . . [¶] [i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety,' '[a]llowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings,' and '[p]roviding diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' (§ 1001.35, subds. (a), (b), and (c).)" (*Ibid.*)

In *People v. Frahs*, *supra*, 9 Cal.5th 619, which held the statute applies retroactively, our Supreme Court quoted and agreed with the Court of Appeal that "the statute's express purpose of promoting ' "[i]*ncreased diversion* of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety" ' indicated 'the Legislature intended the . . . program to apply as broadly as possible.' " (*Id*. at p. 630.) Judge Novak's finding that Williams was not suitable for diversion because he posed an unreasonable risk to public safety cannot be reconciled with these legislative objectives.[15] Once again, we

---

[15] We note that the procedure employed in this case, which resulted in two judges arriving at different factual conclusions about Williams's dangerousness, was highly irregular. There was nothing new in the evidentiary record before Judge Novak, and so, in effect, she appears to have overruled Judge Scott's determination that Williams did not pose a danger within the meaning of the statute and decided the same factual issue all over again, which is not permitted. (See *Wyoming Pac. Oil Co. v. Preston* (1958)

emphasize that our trial courts must give serious consideration to this critical alternative, for the good not just of mentally ill offenders but, ultimately, society at large. (See *O'Hearn, supra,* 57 Cal.App.5th at pp. 300-301.)

The only question, then, is the appropriate remedy. *Moine* reversed the judgment and remanded the case for a new eligibility hearing under section 1001.36, because the dangerousness factor was the only eligibility criteria the trial court in that case had reached. (See *Moine, supra,* 62 Cal.App.5th at p. 452.) Here, Judge Scott found Williams satisfied all of the criteria for diversion and when the case was referred to Judge Novak for another hearing, the only ground upon which she denied mental health diversion was the dangerousness factor we have just discussed. The People do not argue that Williams's request for mental health diversion should be

---

50 Cal.2d 736, 739-740 [judge's finding that defendant evaded service resulted in a "binding adjudication" that precluded second judge from making contrary finding]; *Greene v. State Farm Fire & Casualty Co.* (1990) 224 Cal.App.3d 1583, 1588 [after presiding judge found causes beyond plaintiff's control would prevent case from being timely brought to trial, error for second judge to re-examine facts and find plaintiff was responsible for delay in bringing case to trial].) "For one superior court judge, no matter how well intended, . . . to nullify a duly made, . . . ruling of another superior court judge places the second judge in the role of a one-judge appellate court." (*In re Alberto* (2002) 102 Cal.App.4th 421, 427.) "[B]ecause a superior court is but one tribunal, an order ' " ' "made in one department during the progress of a cause can neither be ignored nor overlooked in another department . . . ." ' " ' " (*Id.* at p. 428.)

Williams has not argued the judgment should be reversed on this basis, however, and we do not reach the issue because we are reversing on another ground. Williams requested diversion and Judge Scott conducted the first evidentiary hearing before the superior court had an established protocol in place to implement the new statute, which generated some confusion below. Given this idiosyncratic timing, we trust that similar irregularities will not recur.

remanded for further proceedings if we conclude (as we have) that Judge Novak erred. In these circumstances, we will reverse the court's judgment and order denying mental health diversion as requested, and avoid the unnecessary delay occasioned by yet a third hearing.

## II.

### *Remaining Issues.*

For guidance on remand, we address one of two remaining issues Williams has raised. As noted, the trial court sentenced Williams to three years of supervised probation. Pursuant to legislation that took effect on January 1, 2021, however, the maximum term for felony probation (with exceptions not relevant here) is two years. (See § 1203.1, subd. (a).) The parties agree this change in the law applies retroactively to Williams, and we agree. (See *People v. Stewart* (Apr. 7, 2021, No. A157857) __Cal.App.5th __ [2021 Cal.App.LEXIS 301].) In the event Williams does not successfully complete pretrial mental health diversion, and should the court again place him on felony probation, Williams's term of probation may not exceed two years.

Because we are reversing the judgment, and with it the order of probation, Williams's final argument that the probation order should be modified to strike the imposition of a monthly $100 probation fee is moot.

## DISPOSITION

The judgment is reversed with directions the defendant be referred to a pretrial mental health diversion program. When and if defendant successfully completes diversion, the court shall dismiss the charges. In the event defendant does not successfully complete diversion, the trial court shall conduct a new sentencing hearing in accordance with this opinion.

_____
STEWART, J.

We concur.


_____
KLINE, P.J.


_____
RICHMAN, J.


*People v. Williams* (A160530)

Trial Court: San Mateo County Superior Court

Trial Judge:       Hon. Lisa A. Novak and Hon. Stephanie G. Garratt

Counsel:

Jeffrey S. Kross for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Amit Kurlekar and Victoria Ratnikova, Deputy Attorneys General, for Plaintiff and Respondent.